IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : CRIMINAL ACTION |
| v. | : |
| | : NO. 07-550-06 |
| KIDADA SAVAGE | : |

**SURRICK, J.**                                                                    NOVEMBER __20__, 2012

## MEMORANDUM

Presently before the Court is Defendant Kidada Savage's Motion to Suppress Physical Evidence Seized from Defendant's Apartment and Automobile and Request For a *Franks* Hearing. (ECF No. 443.) For the following reasons, the Motion and Request will be denied.

**I.    BACKGROUND**[1]

On June 22, 2011, a federal grand jury in Philadelphia returned a seventeen-count Second Superseding Indictment charging Defendant Kidada Savage with: conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count 1); six counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Counts 10-15); retaliating against a witness, in violation of 18 U.S.C. § 1513 (Count 16); and use of fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1), (h)(2) (Count 17). (Second Superseding Indictment, ECF No. 229.)[2] In the Second, Third, and Fourth Superseding Indictments, Defendant was charged, along

---

[1] A more detailed factual background of this case is set forth in our June 1, 2012 Memorandum and Order denying Defendant Kaboni Savage's Motion to Dismiss the Indictment on Double Jeopardy Grounds and Motion to Dismiss Count Nine of the Third Superseding Indictment on Double Jeopardy Grounds. (ECF Nos. 507, 508.)

[2] The First Superseding Indictment was filed on April 8, 2009. (ECF No. 51.) A Third Superseding Indictment was filed on September 7, 2011. (ECF No. 284.) On May 9, 2012, a Fourth Superseding Indictment was filed. (ECF No. 480.) The Fourth Superseding Indictment is

with three co-defendants — her brother Kaboni Savage, Robert Merritt, and Steven Northington.[3]
On March 14, 2011, the Government filed a Notice of Intent to Seek the Death Penalty against
Kaboni Savage, Robert Merritt, and Steven Northington pursuant to 18 U.S.C. §§ 3591, *et seq*.
(ECF Nos. 196, 197, 198.) The Government is not seeking the death penalty for Kidada Savage.

The Fourth Superseding Indictment alleges that Defendant was an enforcer for Kaboni Savage's drug organization who participated in murders, murder conspiracy, arson, conspiracy to distribute controlled substances, witness tampering, and witness retaliation. (Fourth Superseding Indictment 9, ECF No. 480.) Specifically, the Fourth Superseding Indictment alleges that Defendant: threatened a number of potential witnesses and their families related to possible testimony against her brother,[4] enabled threats being issued to witnesses by serving as a conduit and performing research on witnesses and their families (*id.* at 23-24), contributed names to the Internet website "whosarat.com" (*id.* at 28-29), and conspired with others and facilitated the arson-murders of six individuals, including four children, at witness Coleman's home, located at 3256 North Sixth Street, Philadelphia, Pennsylvania (*id.* at 21-23).[5]

---

almost identical to the Third Superseding Indictment, except for four minor changes, which include rearranging three covert acts in chronological order, changing the dates of two overt acts, and changing the initials of one cooperating co-conspirator.

[3] Lamont Lewis was charged in the First Superseding Indictment. Lewis entered a guilty plea on April 21, 2011.

[4] These individuals included Eugene Coleman (Fourth Superseding Indictment 16-17), Coleman's brother (*id.* at 18), and Craig Oliver's sister (*id.* at 19).

[5] The Fourth Superseding Indictment alleges that Savage and Defendant solicited and ordered Lewis and Merritt to set fire to Coleman's home in retaliation for Coleman's cooperation with the Government and testimony before the federal grand jury related to Savage's 2005 federal drug conspiracy trial. (*Id.* at 21.) Six people were killed in the fire. (*Id.*)

Pursuant to the Second Superseding Indictment and a bench warrant issued by the Honorable Elizabeth T. Hey, United States Magistrate Judge (Order for Bench Warrant, ECF No. 231), Defendant was arrested on June 22, 2011. (Def.'s Mot. Preclude Death Penalty 6, ECF No. 336.) On March 30, 2012, Defendant filed the instant Motion to Suppress Physical Evidence Seized From Her Apartment and From the Search of Her 2005 Nissan Altima and to Request a *Franks* Hearing. (Def.'s Suppression Mot., ECF No. 443.) The Government filed an Omnibus Response in Opposition to Defendants' Motions to Suppress Physical Evidence Obtained Pursuant to Valid Search Warrants. (Gov't's Resp., ECF No. 466.)

A suppression hearing was held on June 11 and 12, 2012. (Min. Entries, ECF No. 516, 519.) At the hearing, the Government presented testimony from Kevin Lewis, a Special Agent with the Federal Bureau of Investigation ("FBI"). (June 11, 2012 Hr'g Tr. 10 (on file with Court).) Special Agent Lewis has been the case agent for the FBI investigation into the Kaboni Savage Organization ("KSO") for the past thirteen years. (*Id.* at 11.) As case agent, Special Agent Lewis was heavily involved in wiretap applications and field work related to the KSO investigation. (*Id.* at 11, 36, 231-48.) Defendant offered no evidence or testimony at the suppression hearings.

The testimony of Special Agent Lewis was credible.

## II. FINDINGS OF FACT

On June 22, 2011, a federal grand jury returned a seventeen-count Second Superseding Indictment, which charged Defendant with nine separate counts. (Second Superseding Indictment.) As part of the Second Superseding Indictment, the grand jury issued a Notice of Forfeiture. (*Id.* at 63-64.) Without identifying specific real property subject to forfeiture, the

3

Notice indicated that Defendant shall forfeit "any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Section 1962." (*Id.* at 64.) The Notice of Forfeiture was filed pursuant to, and tracked the language of, 18 U.S.C. § 1963(a). (*Id.*)

Following the grand jury's return of the Second Superseding Indictment and Notice of Forfeiture on June 22, 2011, Special Agent Lewis, his partner, Tom Zielinski, a Detective in the Philadelphia District Attorney's Office, and Philadelphia Police Department Homicide Detective Kenneth Rossiter went to Dresher, Pennsylvania to arrest Defendant at her place of employment, Prudential Annuities. (June 11 Hr'g Tr. 74, 162, 229-30, 239.) Although Special Agent Lewis intended to arrest Defendant the following day, he expedited the process due to attention from the media, which he believed might increase the risk of flight. (*Id.* at 249.) Before effectuating the arrest, Special Agent Lewis contacted a representative in the Human Resources Department of Prudential to discuss the situation. (*Id.* at 230.) Special Agent Lewis arrived at Prudential's facilities at approximately 1:00 p.m. and met with Defendant in a conference room. (*Id.* at 230-31, 250.) At that time, Special Agent Lewis informed Defendant that she was under arrest and placed her in handcuffs. (*Id.* at 230-31, 251.) During this initial period, Defendant was kept in a separate room while Special Agent Lewis attempted to arrange a disruption free exit from the facility. (*Id.*) Unprovoked, Defendant repeatedly asked Special Agent Lewis why he would believe a "Syruphead." (*Id.* at 230-31.) Defendant was talking about Lamont Lewis. (*Id.* at 231.) Defendant inquired about her property at Prudential, including her vehicle, a Nissan Altima, VIN No. 1N4AL11D95C171002, which had been purchased in 2004. (*Id.* at 231-32, 257, 273.) Defendant said that she wanted to have someone come and pick up her vehicle. (*Id.*

4

at 231-32.) Special Agent Lewis replied to Defendant that her vehicle was being seized for forfeiture, and Defendant gave the keys to the vehicle to the law enforcement officials. (*Id.*)

Special Agent Lewis had concluded that Defendant's vehicle was subject to forfeiture as part of the proceeds of the KSO racketeering activity. (*Id.* at 232.) Specifically, Special Agent Lewis testified that "Kaboni Savage, during the course of the cell block wiretap, repeatedly told individuals that he had purchased that car for Kidada Savage, and Kidada Savage had told other witnesses that the car had been purchased for her by Kaboni Savage." (*Id.* at 233.) Savage's admissions regarding the purchase of the Altima for Defendant were made in recorded conversations through the toilet bowl in Savage's cell at the Federal Detention Center in Philadelphia. (*Id.* at 254-56.) At least one other witness confirmed Savage's purchase of the automobile on behalf of the Defendant. (*Id.*) Special Agent Lewis testified that individuals in the FBI's forfeiture department obtained records on Defendant's automobile and learned that the vehicle was originally registered in the name of Defendant's sister, Conchetta, but was changed to Defendant's name at some point. (*Id.* at 257.) Title documentation relating to Defendant's vehicle was obtained approximately one month before Defendant's arrest. (*Id.* at 259.)

In addition, Kaboni Savage had previously informed Special Agent Lewis that he had never held lawful employment. (*Id.* at 233.) From his time as the case agent investigating the KSO, Special Agent Lewis had known Kaboni Savage to earn income only by way of moving drugs or other illegal activity. (*Id.*) The information obtained by Special Agent Lewis with regard to the purchase of Defendant's automobile was from a combination of witness interviews, grand jury testimony, and wiretap evidence. (*Id.* at 271.)

Following her arrest, Defendant's automobile was transported to the basement of the

Federal Building by an FBI agent. (*Id.*) Special Agent Lewis then directed another agent, Special Agent Bob Parks, to perform an inventory search of Defendant's vehicle. (*Id.* at 233-35.) Special Agent Lewis testified that it is the policy of the FBI to perform an inventory search of every vehicle seized by the FBI to ensure that the FBI can accurately account for property located in the automobile and to guarantee the safety of the facility in which the vehicle is being stored. (*Id.* at 234.) FBI policy does not limit where agents can search during an inventory search of a forfeited vehicle. (*Id.* at 275.)

During his inventory search of Defendant's vehicle, Special Agent Parks identified a piece of paper in the center console of the automobile, which contained the name of a witness known to him. (*Id.* at 235.) Special Agent Parks directed Detective Zielinkski's attention to this piece of paper. (*Id.*) Eventually, this evidence was shown to Special Agent Lewis. (*Id.*) Upon reviewing the paper recovered from Defendant's automobile, Special Agent Lewis noticed that the paper contained the name and address of multiple witnesses that had been involved in the 2005 federal drug conspiracy investigation into the KSO and who were potential witnesses in the current investigation into racketeering activity and related murders. (*Id.* at 236.)

In addition to the paper with witness names and addresses, the inventory search of Defendant's vehicle revealed a letter from Dawud Bey to Defendant, paperwork related to Defendant's purchase of a firearm, and a philly.com article, published on June 20, 2004, about a plea agreement involving Craig Oliver in the 2005 federal drug conspiracy case against Kaboni Savage. (*Id.* at 272.) In addition, Special Agent Lewis testified that the FBI was aware Defendant had purchased a firearm prior to her arrest, and that Defendant confirmed during post-arrest questioning that she owned a gun and that it was located at her residence. (*Id.* at 238.)

On June 23, 2011, Special Agent Lewis drafted an Affidavit in support of a Search Warrant to search Defendant's home in Philadelphia, Pennsylvania. (Def.'s Suppression Mot. Ex. B.) That same day, the Search Warrant was issued by the Honorable M. Faith Angell, United States Magistrate Judge, to search Defendant's apartment for "notes and notebooks containing names and addresses of witnesses and their family members; computer hard drives, disks, thumb drives, zip drives, and electronic media containing names and addresses of witnesses and their family members; and a firearm." (Def.'s Suppression Mot. Ex. A.) Special Agent Lewis testified that the only new evidence that formed the basis of his Affidavit was the search of Defendant's vehicle and the transfer in title of the automobile from Conchetta Savage to Defendant. (June 11 Hr'g Tr. 274.) Defendant claims that the Government has yet to provide a true and correct copy of any receipts for property seized pursuant to the search of Defendant's apartment, but expects the Government to introduce items seized from the apartment at trial. (Def.'s Suppression Mot. 3-4.)

## III. CONCLUSIONS OF LAW

Defendant seeks to suppress evidence seized during the warrantless inventory search of her automobile and any evidence discovered during the search of her residence. Defendant advances two arguments in support of her Motion. First, she claims that the inventory search of her Altima was an illegal warrantless search conducted without a proper basis and was instead a pretext for an investigatory search. (Def.'s Suppression Mot. 4, 6-7.) Second, Defendant claims that the warrant obtained by the FBI to search her apartment was based on inadmissible evidence and an Affidavit rife with stale information and false statements. (*Id.* at 4-6, 7-9.) The Government responds that the search of Defendant's Altima was a valid inventory search conducted pursuant

to law enforcement protocol and that the Search Warrant for Defendant's apartment was issued based upon an accurate and detailed Affidavit, which provided more than sufficient probable cause to a neutral and detached magistrate. (Gov't's Resp. 15-20.)

### A. The Warrantless Search of Defendant's Automobile Was a Valid Inventory Search

The Fourth Amendment to the Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). The Government agrees that the search performed by the FBI was not pursuant to a warrant. (June 11 Hr'g Tr. 228.) Accordingly, the burden is on the Government to demonstrate that the search and seizure was reasonable. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

Out of necessity, courts have carved out broader guidelines when dealing with warrantless searches of automobiles. *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976) ("[T]he inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible."). Nevertheless, despite the distinctions between warrantless searches of the home and automobiles, "the word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge v. New Hampshire*, 403 U.S. 443, 461 (1971).

One exception to the Fourth Amendment's preference for warrants is for inventory searches of automobiles. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) ("[A]n inventory search

may be 'reasonable' under the Fourth Amendment even though it is not conducted pursuant to a warrant based upon probable cause."). Inventory searches are justified on three "community care-taking" grounds: (1) the protection of the owner's property while it remains in police custody; (2) the protection of law enforcement officials from claims by the property owner; and (3) the protection of law enforcement officials from potential hazards in the impounded automobile. *United States v. Frank*, 864 F.2d 992, 1001-03 (3d Cir. 1988) (citing *Opperman*, 428 U.S. at 369). These "benign purposes" justify the inventory search so that "there is no significant danger of compromising the individual's legitimate expectation of privacy." *United States v. Abbott*, 584 F. Supp. 442, 446 (W.D. Pa. 1984) (describing the Supreme Court's holding in *Opperman*)).

### 1. The Seizure of Defendant's Automobile Was Lawful

The first inquiry is whether the FBI's post-arrest seizure of Defendant's automobile was lawful. *See United States v. Salmon*, 944 F.2d 1106, 1119 (3d Cir. 1991) (citing *United States v. Bush*, 647 F.2d 357, 366 (3d Cir. 1981)). Defendant was arrested on June 22, 2011 pursuant to the bench warrant issued that same day following the grand jury's return of a Second Superseding Indictment. The Second Superseding Indictment charged Defendant with nine separate counts of participating in a criminal enterprise, murder, arson, witness intimidation, and witness retaliation. Immediately following Defendant's arrest, her automobile, a Nissan Altima, was seized by the FBI and impounded at their facilities. (*See* Second Superseding Indictment.) The issue to be decided is whether the Second Superseding Indictment,[6] the Notice of Forfeiture, and evidence

---

[6] For the purposes of determining the validity of the Notice of Forfeiture and the ensuing seizure of Defendant's automobile, the Second Superseding Indictment, which served as the basis for Defendant's arrest and the Notice of Forfeiture, is operative.

forming the basis for those documents justified law enforcement officials' seizure of Defendant's automobile.

Forfeiture of property in a criminal matter requires that "the indictment or information contain[ ] notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute." Fed. R. Crim. P. 32.2(a). The applicable statute here is the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961, *et seq*. A violation of Section 1963 requires forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962." 18 U.S.C. § 1963(a)(3). "Racketeering activity" includes a long list of predicate criminal behavior. *See* 18 U.S.C. § 1961(1). Two acts of "racketeering activity," along with a showing of continuity and the threat of continued criminal activity, constitute a "pattern." *See United States v. Palfrey*, 499 F. Supp. 2d 34, 46 (D.D.C. 2007) (citing *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

In this case, the Second Superseding Indictment details many criminal activities perpetrated by Defendant, constituting RICO predicates and establishing a pattern of racketeering activity. The alleged criminal activity includes the facilitation of murders, murder conspiracy, conspiracy to distribute controlled substances, witness tampering, and witness retaliation all in the service of the Savage drug distribution enterprise. (Second Superseding Indictment 9.) Pursuant to the alleged criminal conduct, the grand jury returned a Notice of Forfeiture, which generally mirrored Section 1963 and specifically alerted Defendant that she would forfeit any property derived from racketeering activity. (*Id.* at 63-64.)

The notice provided to a defendant need not "list all forfeitable interests in the indictment," *United States v. DeFries*, 129 F.3d 1293, 1315 n.17 (D.C. Cir. 1997), nor must the indictment establish a factual nexus between the charges and the unnamed property, *Palfrey*, 499 F. Supp. 2d at 48-49. *Cf. United States v. Sarbello*, 985 F.2d 716, 719-20 (3d Cir. 1993) (holding that forfeiture notice provided sufficient notice to defendant despite slight discrepancy between interrogatory in special verdict form and indictment). Rather, the grand jury need only find probable cause for the criminal charges when returning an indictment. *See United States v. Kaley*, 677 F.3d 1316, 1326 (11th Cir. 2012) (finding that a defendant may not challenge the sufficiency of the evidence supporting a grand jury's probable cause determination).

Prior to the grand jury returning the Second Superseding Indictment, the investigation into Savage, Defendant and the KSO revealed wiretap recordings where Savage "repeatedly told individuals that he had purchased that car for [Defendant], and [Defendant] had told other witnesses that that car had been purchased for her by Kaboni Savage." (June 11 Hr'g Tr. 233.) At least one witness informed Special Agent Lewis of this. (*Id.* at 233-34.) Throughout the course of the investigation, Special Agent Lewis had never known Savage to have any means of legitimate employment. (*Id.* at 233.) Once arrested, Savage confirmed as much. (*Id.*) Until the grand jury returned the Second Superseding Indictment, Special Agent Lewis had spent approximately twelve years investigating Kaboni Savage's extensive drug enterprise, which generated revenue through the distribution of controlled substances. (*Id.*) By the time the federal grand jury returned the Second Superseding Indictment, the investigation had provided evidence that Defendant's automobile was the proceed of racketeering activity.

Following Defendant's arrest at her place of employment, law enforcement officials seized

Defendant's automobile and impounded it at federal facilities. (*Id.*) Based on the Second Superseding Indictment's allegations of a RICO conspiracy, the inclusion of a Notice of Forfeiture, which alerted Defendant that she would forfeit the proceeds of the RICO enterprise, and the Government's evidence reflecting that Defendant's automobile was a proceed of the RICO enterprise, it is clear that the seizure of Defendant's automobile was lawful.

        2.        *The Search of Defendant's Automobile Was Lawful*

The next inquiry is whether law enforcement officials exceeded the permissible bounds of an inventory search when searching the center console of Defendant's automobile. Defendant alleges that law enforcement conducted their search for investigative purposes, later labeling it as an inventory search in justification.

An inventory search of seized property is not a "totally mechanical" procedure. *Mundy*, 621 F.3d at 290; *see also Florida v. Wells*, 495 U.S. 1, 4 (1990) (arguing same). To ensure inventory searches are not "a ruse for a general rummaging in order to discover incriminating evidence," the searches must be performed using "standardized procedures." *United States v. Lopez*, 547 F.3d 364, 370 (2d Cir. 2008) (citing *Wells*, 495 U.S. at 4). "The requirement that inventory searches be conducted according to such criteria or routine strikes a balance between the government's legitimate interests in such searches and the owner's legitimate expectation of privacy in the contents of the seized vehicle." *Salmon*, 944 F.2d at 1120 (internal citations and footnotes omitted). Standardized procedures limit law enforcement officials in two important ways: first, they create limitations on whether to search a seized vehicle; and second, they create reasonable boundaries for the search of the automobile. *Id.* Law enforcement "policy and

12

procedure need not be formally written so long as it is standardized, consistently applicable in like situations, and complied with by the investigating officer in a particular case." *United States v. Felder*, No. 07-540, 2008 WL 2051967, at *4 (E.D. Pa. May 13, 2008).

With regard to the decision to search Defendant's vehicle, Special Agent Lewis testified that inventory searches of forfeited vehicles are non-discretionary. (June 11 Hr'g Tr. 235.) The inventory search policy is in place, in part, because the FBI is taking responsibility for the automobile and wants to ensure that every piece of property within the automobile is tracked to avoid potential liability. (*Id.* at 234.) Similarly, the FBI performs these searches for safety purposes. (*Id.*) Based upon the FBI's policy to search every forfeited vehicle, we are satisfied that the decision to search Defendant's forfeited vehicle was proper. *See Salmon*, 944 F.2d at 1121 (finding sufficient testimony concerning pre-existing police department policy to search all seized vehicles); *Frank*, 864 F.2d at 1003 (finding sufficient pre-existing unwritten policy to search each forfeited automobile); *United States v. Kordosky*, 921 F.2d 722, 723 (7th Cir. 1991) (same).

In performing an inventory of Defendant's vehicle, Special Agent Parks searched and recovered relevant evidence from the center console of the vehicle. (June 11 Hr'g Tr. 236.) The center console is a closed container. *United States v. White*, No. 06-377, 2007 WL 2407290, at *4 (E.D. Pa. Aug. 17, 2007) ("[T]he term 'container . . . denotes any object capable of holding another object. It thus includes closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like.'") (quoting *New York v. Belton*, 453 U.S. 454, 460 (1981)).

Defendant cites *Florida v. Wells* and *United States v. Salmon* in support of her position. In *Florida v. Wells*, the Supreme Court found unlawful a search performed by the Florida Highway Patrol of a suitcase located in the trunk of an impounded vehicle. *Wells*, 495 U.S. at 2, 4. Suppression was necessary where the Florida Highway Patrol lacked any policy on the opening of closed containers located in a seized automobile. *Id.* at 4-5. Similarly, in *United States v. Salmon*, the Third Circuit Court of Appeals invalidated a search of a gym bag in the trunk of a vehicle seized for forfeiture pursuant to involvement in a narcotics transaction. *Salmon*, 944 F.2d at 1118, 1121. Once again, the lack of any articulated policy regarding the scope of the search of a seized vehicle, particularly involving closed containers, made the search unlawful. *Id.* Neither *Wells* nor *Salmon* inhibit law enforcement officials from searching closed containers as long as the Government puts forth evidence of standard protocol regarding the scope of an appropriate inventory search. *See United States v. Bansal*, 663 F.3d 634, 664 (3d Cir. 2011) (finding that search was a proper inventory search as it was conducted pursuant to standardized DEA procedures); *see also Illinois v. Lafayette*, 462 U.S. 640, 648 (1983) ("[W]e hold that it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures.").

During the suppression hearing, Special Agent Lewis provided testimony regarding FBI policy on inventory searches. When specifically questioned about the bounds of an investigative search pursuant to FBI policy, Special Agent Lewis testified that there is no limit as to where an agent may look, as the vehicle owner's property can be found in any portion of the automobile. (*Id.* at 275.) The Government's policy is reasonable and makes perfect sense.

14

We are satisfied that Special Agent Parks's inventory search of Defendant's automobile was lawful. Even though the FBI policy was described by Special Agent Lewis in general terms, this case is easily distinguished from *Wells* and *Salmon*, where there was a complete absence of evidence with regard to the relevant law enforcement officials' protocol on the scope of inventory searches. We are satisfied that the center console of Defendant's vehicle is an area where items of value or danger might be found, and that Special Agent Parks's search of that area was reasonable and consistent with the FBI's policy to search the entire automobile. *See United States v. Wilson*, 938 F.2d 785, 789-90 (7th Cir. 1991) (finding policy requirement of searching the "contents" of a vehicle to encompass closed containers); *see also Mundy*, 621 F.3d at 292 ("Though the PPD Live Stop Policy does not contain magic words relating specifically to closed containers, its reference to 'any . . . personal property of value' sufficiently regulated the scope of a permissible inventory search . . . ."); *United States v. Thompson*, 181 F. App'x 246, 247 (3d Cir. 2006) (finding lawful search of center console pursuant to policy that provided for the inventory of the entire vehicle).

Accordingly, the search of Defendant's automobile was lawful, and the evidence obtained from the search of the center console of the vehicle – the paper listing witness names and addresses, the letter to Dawud Bey, the information pertaining to Defendant's purchase of a firearm, and the philly.com article – was obtained pursuant to a lawful search.

### B. The Search of Defendant's Apartment Was Pursuant to a Valid Warrant

Defendant contends that with or without the evidence obtained from Defendant's vehicle, there was no probable cause to search Defendant's apartment and the evidence recovered therein should be suppressed. To that end, Defendant advances three principal arguments: (1) the

15

evidence obtained from the search of Defendant's automobile should be suppressed and stricken from Special Agent Lewis's Affidavit as fruit of the poisonous tree; (2) the evidence in Special Agent Lewis's Affidavit was stale; and (3) Special Agent Lewis's Affidavit contained knowing, intentional, or reckless material misrepresentations and omissions. We reject each of these arguments.

As an initial matter, we note that "[w]hen faced with a challenge to a magistrate's probable cause determination, a reviewing court must remember that its role is limited. It is not to conduct a *de novo* review. Rather it simply ensures that probable cause existed." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) (citing *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). The magistrate need only have a substantial basis to conclude that a search would uncover relevant evidence. *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir. 1983) (citing *Gates*, 462 U.S. at 235)). "This does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions; it does require the application of a common sense standard." *Tehfe*, 722 F.2d at 1117 (citing *United States v. Ventresca*, 380 U.S. 102, 108, 109 (1965)).

> 1. *The Evidence Recovered From Defendant's Car Was Not Fruit of the Poisonous Tree*

Defendant claims that the FBI's search of Defendant's vehicle was a pretextual investigatory search, which uncovered evidence that should be suppressed and struck from the Affidavit that served as the basis for Magistrate Judge Angell's issuance of a Search Warrant for Defendant's apartment. *See United States v. Molt*, 444 F. Supp. 491, 499 (E.D. Pa. 1978) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)) (holding that unlawful warrantless seizure rendered subsequent search and seizure pursuant to a warrant unlawful as fruit of the poisonous

16

tree). As discussed above, the warrantless inventory search of Defendant's vehicle, which, in part served as the basis for Special Agent Lewis's Affidavit, was lawful. Accordingly, the evidence obtained from Defendant's apartment was not the fruit of the poisonous tree.

### 2. The Evidence in the Affidavit Was Not Stale

"Probable cause to search exists where information suggests that the items sought will be in the location searched." *United States v. Marranca*, 98 F. App'x 179, 181 (3d Cir. 2004). When considering whether to issue a search warrant, a magistrate must consider that "[t]he likelihood the evidence sought is still in place depends on a number of variables, such as the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched." *United States v. Greene*, No. 07-120, 2008 WL 2246923, at *3 (E.D. Pa. June 2, 2008) (citing *United States v. Harris*, 482 F.2d 1115, 1119 (3d Cir. 1973)). Where, as here, an affidavit alleges an ongoing criminal enterprise involving a pattern of criminal activity, "the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit loses significance." *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005) (finding request for authorization of hidden cameras timely where misconduct was a routine practice over a number of years). While "direct evidence linking the place to be searched to the crime is not required for the issuance of a search warrant," *United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993), probable cause creating a nexus between the suspected criminal activity and the place to be searched may be inferred. *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (citing *Jones*, 994 F.2d at 1051).

Here, Special Agent Lewis drafted a twenty-page Affidavit, which detailed the history of

17

the KSO investigation and provided information regarding the evidence recovered from the search of Defendant's vehicle. (Def.'s Suppression Mot. Ex. B. at ¶ 3.) In so doing, Special Agent Lewis cited the ongoing fourteen-year pattern of conduct of drug distribution, violence, witness intimidation, and witness retaliation, much of which was specific to Defendant. (*Id.*) Special Agent Lewis informed the magistrate that Defendant had confirmed the presence of a handgun in a safe in her apartment the day prior. (*Id.* at ¶ 15.) Special Agent Lewis's Affidavit highlighted the evidence recovered from the search of Defendant's vehicle, including the paper with witness names and addresses, the letter from Dawud Bey, a co-conspirator whom Savage suspected of being a confidential witness and whom Savage had threatened as recently as April 2010, paperwork related to Defendant's purchase of a firearm, and a philly.com article, published on June 20, 2004, about a plea agreement involving Craig Oliver in the 2005 federal drug conspiracy case against Savage. (*Id.* at ¶¶ 17-19.) The Affidavit discussed the October 9, 2004 arson murders of witness Coleman's family. (*Id.* at ¶ 9.) The Affidavit also apprised the magistrate of the March 17, 2011 discovery by U.S. Bureau of Prison officials of printouts in Savage's prison cell, which detailed incarcerated cooperating witnesses' identifications and locations. (*Id.* at ¶ 19.)

The Search Warrant commanded the FBI to seize records, notes, and documents related to witnesses and informants and their families, electronic media related to the same, evidence pertaining to the ownership and/or occupancy of the premises, and Defendant's handgun. (Def.'s Suppression Mot. Ex. A.)

We reject Defendant's assertion that the information provided was stale. The evidence set forth in Special Agent Lewis's Affidavit reflected a continuing pattern of criminal conduct meant

18

to support the KSO. Similarly, the Affidavit informed the magistrate of the ongoing investigation into witness intimidation and witness retaliation. In light of the history of the KSO investigation, the ongoing review of witness intimidation and witness retaliation, the evidence lawfully obtained from Defendant's vehicle the day prior, and Defendant's statement about her gun being located in her home, we find that the magistrate had sufficient timely information creating a substantial basis to believe that relevant evidence would be found in Defendant's apartment.

### 3. *Defendants Failed to Highlight Any Material Misrepresentations or Omissions*

Defendant concludes that Special Agent Lewis's Affidavit contained material misrepresentations and omissions, which were made knowingly and intentionally, or with a reckless disregard for the truth. While Defendant raises this serious allegation, she fails to point to any specific misrepresentations or omissions. Instead, Defendant merely claims that the misrepresentations and omissions pertain to "information concerning the items allegedly seized in the 2005 Altima." (Def.'s Suppression Mot. 9.) "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *see also United States v. Heilman*, 377 F. App'x 157, 178 (3d Cir. 2010) (finding defendant failed to meet the minimum threshold for a *Franks* hearing when defendant did not offer any examples of material misrepresentations or omissions in affidavit).

Defendant has clearly failed to highlight a single misrepresentation or omission. Accordingly, Defendant's Request for a *Franks* hearing is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Physical Evidence Seized from Defendant's Residence and Automobile and Defendant's Request for a *Franks* Hearing will be denied.

An appropriate Order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**