IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07-550-06 |
| KIDADA SAVAGE | : | |

**SURRICK, J.**                                        **NOVEMBER  20 , 2012**

## MEMORANDUM

Presently before the Court is Defendant Kidada Savage's Motion to Suppress Post-Arrest

Statements.  (ECF No. 444.)  For the following reasons, the Motion will be denied.

## I.     BACKGROUND[1]

On June 22, 2011, a federal grand jury in Philadelphia returned a seventeen-count Second

Superseding Indictment charging Defendant Kidada Savage with:  conspiracy to participate in a

racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count 1); six counts of murder in

aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Counts 10-15); retaliating against a

witness, in violation of 18 U.S.C. § 1513 (Count 16); and use of fire to commit a felony, in

violation of 18 U.S.C. § 844(h)(1), (h)(2) (Count 17).  (Second Superseding Indictment, ECF No.

229.)[2]  In the Second, Third, and Fourth Superseding Indictments, Kidada Savage was charged

---

[1] A more detailed factual background of this case is set forth in our June 1, 2012
Memorandum and Order denying Defendant Kaboni Savage's Motion to Dismiss the Indictment
on Double Jeopardy Grounds and Motion to Dismiss Count Nine of the Third Superseding
Indictment on Double Jeopardy Grounds.  (ECF Nos. 507, 508.)

[2] The First Superseding Indictment was filed on April 8, 2009.  (ECF No. 51.)  A Third
Superseding Indictment was filed on September 7, 2011.  (ECF No. 284.)  On May 9, 2012, a
federal grand jury in Philadelphia returned a Fourth Superseding Indictment.  (ECF No. 480.)
The Fourth Superseding Indictment is almost identical to the Third Superseding Indictment,
except for four minor changes, which include rearranging three covert acts in chronological

along with three co-defendants — her brother Kaboni Savage, Robert Merritt, and Steven

Northington.[3]  On March 14, 2011, the Government filed a Notice of Intent to Seek the Death

Penalty against Kaboni Savage, Robert Merritt, and Steven Northington pursuant to 18 U.S.C. §§

3591, *et seq*.  (ECF Nos. 196, 197, 198.)  The Government is not seeking the death penalty for

Kidada Savage.

The Fourth Superseding Indictment alleges that Kidada Savage was an enforcer for her

brother's drug organization and that she participated in murders, murder conspiracy, arson,

conspiracy to distribute controlled substances, witness tampering, and witness retaliation.

(Fourth Superseding Indictment 9.)  Specifically, the Fourth Superseding Indictment alleges that

Kidada Savage:  threatened a number of potential witnesses and their families relating to possible

testimony against Kaboni Savage,[4] enabled threats being issued to witnesses by serving as a

conduit and performing research on witnesses and their families (*id.* at 23-24), contributed names

to the Internet website "whosarat.com" (*id.* at 28-29), and conspired with others and facilitated

the arson-murders of six individuals, including four children, at witness Coleman's home,

located at 3256 North Sixth Street, Philadelphia, Pennsylvania (*id.* at 21-23).[5]

---

order, changing the dates of two overt acts, and changing the initials of one cooperating co-
conspirator.

[3] Lamont Lewis was charged in the First Superseding Indictment.  The charges against
Lewis were disposed of by guilty plea on April 22, 2011.

[4] These individuals included Eugene Coleman (Fourth Superseding Indictment 16-17),
Coleman's brother (*id.* at 18), and Craig Oliver's sister (*id.* at 19).

[5] The Fourth Superseding Indictment alleges that Kaboni Savage and Kidada Savage
solicited and ordered Lewis and Merritt to set fire to Coleman's home in retaliation for
Coleman's cooperation with the Government and testimony before the federal grand jury related
to Kaboni Savage's 2005 federal drug conspiracy trial.  (Fourth Superseding Indictment 21.)  In

Pursuant to the Second Superseding Indictment, Kidada Savage was arrested on June 22, 2011.  On March 30, 2012, she filed a Motion to Suppress Post-Arrest Statements.  (Def.'s Mot., ECF No. 444.)  The Government filed a Response in Opposition to Defendant's Motion to Suppress Post-Arrest Statements on April 9, 2012.  (Gov't's Resp., ECF No. 455.)

A suppression hearing was held on June 11 and 12, 2012.  (Min. Entries, ECF No. 516, 519.)  At the hearing, the Government presented testimony from Kevin Lewis, a Special Agent with the Federal Bureau of Investigation ("FBI").  (June 11, 2012 Hr'g Tr. 10 (on file with Court).)  Special Agent Lewis has been the case agent for the FBI investigation into the Kaboni Savage Organization ("KSO") for the past thirteen years.  (*Id.* at 11.)  As case agent, Special Agent Lewis was heavily involved in wiretap applications and field work related to the KSO investigation.  (*Id.* at 11, 36, 231-48.)  Kidada Savage and her co-defendants provided no evidence or testimony during the suppression hearings.

## II.    FINDINGS OF FACT

On June 22, 2011, a federal grand jury returned a seventeen-count Second Superseding Indictment, which charged Kidada Savage with nine separate counts.  (Second Superseding Indictment.)  Following the grand jury's return of the Second Superseding Indictment, Special Agent Lewis, his partner, Thomas Zielinski, a Detective in the Philadelphia District Attorney's Office, and Philadelphia Police Department Homicide Detective Kenneth Rossiter went to

---

2005, following a seven-week jury trial before the Honorable Mary A. McLaughlin, a jury found Kaboni Savage guilty of fourteen of the sixteen counts, including drug conspiracy (Count 1), money laundering (Counts 4-8), possessing a firearm as a convicted felon (Count 12), threatening a witness (Counts 13-15), threatening to retaliate against a witness (Counts 16 and 18), and using a telephone to facilitate drug trafficking (Counts 19 and 20).  *See United States v. Savage*, No. 04-269 (E.D. Pa.), at ECF No. 716.  As a result of those convictions, he is presently serving a thirty-year sentence.

Dresher, Pennsylvania to arrest Defendant at her place of employment, Prudential Annuities. (June 11 Hr'g Tr. 74, 162, 229-230, 239.)  Although Special Agent Lewis intended to arrest Defendant the following day, he expedited the process due to attention from the media, which he believed might increase the risk of flight.  (*Id.* at 249.)  Before effectuating the arrest, Special Agent Lewis contacted a representative in the Human Resources Department at Prudential to discuss the situation.  (*Id.* at 230.)

Special Agent Lewis arrived at Prudential's facilities at approximately 1:00 p.m. and met with Defendant, who was then twenty-nine years old, in a conference room.  (*Id.* at 230-31, 247, 250.)  At that time, Special Agent Lewis explained to Defendant that she was under arrest for six counts of murder, arson, racketeering, conspiracy, and additional charges.  (*Id.* at 231.)  Special Agent Lewis placed Defendant in handcuffs.  (*Id.* at 251.)  Immediately after her arrest, Defendant was kept in a separate room while Special Agent Lewis attempted to arrange a disruption free exit from the facility.  (*Id.* at 231.)  Unprovoked, Kidada Savage repeatedly stated to Special Agent Lewis why he would believe a "syruphead."  (*Id.* at 230-31.)  Special Agent Lewis responded "[w]hat are you talking about?"  Kidada Savage said Lamont Lewis.  (*Id.*)  Defendant inquired about her property at Prudential, including her vehicle, a Nissan Altima, VIN #1N4AL11D95C171002, which was purchased in 2004.  (*Id.* at 231-32, 257, 273.)  Defendant said that she wanted to have someone come and pick up her vehicle; Special Agent Lewis replied that the vehicle was being seized for forfeiture.  (*Id.* at 231-32.)  Defendant gave the keys to the vehicle to the law enforcement officials.  (*Id.* at 232.)

After escorting Defendant to the law enforcement officials' automobile, Special Agent Lewis stood outside the vehicle and called Defendant's mother, Barbara Savage, to inform her

that Defendant had been arrested and to inquire about a firearm known to be possessed by Defendant. (*Id.* at 238, 260-61.) Shortly thereafter, during the ride from Prudential's offices in Dresher to the FBI's offices in Philadelphia, Defendant repeatedly referred to Lamont Lewis as a "syruphead," a "drunk," and a "murderer." (*Id.* at 262; Gov't's Resp., App. 2.) While transporting Defendant, Special Agent Lewis realized that there might be timing issues with regard to the processing of Defendant and getting her in front of a magistrate judge. (June 11 Hr'g Tr. 240.) Special Agent Lewis decided to inform Defendant of her *Miranda* rights so that he could ask questions and be assured that Defendant understood the ramifications of making statements to the officers. (*Id.* at 240, 262.) In the presence of Officer Zielinksi and Detective Rossiter, Special Agent Lewis administered a formal *Miranda* warning to Defendant. (*Id.* at 262.) Special Agent Lewis told Defendant that she had the right to remain silent and that anything she said could be used against her in court, that she had the right to consult with an attorney before questioning, that she had the right to have an attorney present during questioning, and that if Defendant could not afford an attorney, one would be appointed for her free of charge. (*Id.* at 241.) Finally, Special Agent Lewis told Defendant that if she decided to start answering questions she could later change her mind and stop answering questions whenever she wanted. (*Id.*) When asked whether she understood those rights, Defendant answered that she did. (*Id.*) Special Agent Lewis then asked Defendant if she was willing to answer questions and Defendant said that she was. (*Id.*) Defendant was not impaired by alcohol or drugs, did not appear unduly distressed, and gave no indication that she did not understand the proceedings. (*Id.* at 248.)

Initially, Special Agent Lewis made overtures about Defendant cooperating with the FBI's investigation into the KSO. (*Id.*) Special Agent Lewis advised that Defendant was going

to jail and that she would not be out on bail.  (*Id.*)  Special Agent Lewis and his colleagues asked Defendant about postings on the website "whosarat.com" made by an e-mail address associated with Defendant.  (*Id.* at 242.)  While doing so, Special Agent Lewis mentioned Defendant's involvement in Steven Northington's state murder trial and the numerous inaccuracies in her testimony.  (*Id.* at 263-63.)  Defendant confirmed that she was known by a nickname ("Dizmatic") that was part of the e-mail address "Dizmatic@yahoo.com," but denied making any postings on the website "whosarat.com."  (*Id.* at 242-43.)  Defendant said she created the e-mail account at the request of Kareem Bluntly.  (Gov't Resp., App. 2.)  Special Agent Lewis informed Defendant that the postings by "Dizmatic@yahoo.com" on "whosarat.com" occurred approximately one year after Bluntly passed away.  (*Id.*)  Defendant replied that many people, including her friend, Halisa Henry, her sister, Conchetta Savage, and her fiancé, Rasnetfa Douglas, had access to the e-mail account.  (*Id.*)

In the course of being questioned about the events on October 8 and 9, 2004, Defendant stated that she recalled Lamont Lewis being in her house the night before the arson-murder and Lamont Lewis speaking with Kaboni Savage on the phone, but denied passing messages from her brother to Lamont Lewis regarding the arson-murders.  (June 11 Hr'g Tr. 245, 266; Gov't Resp. App. 2.)  Special Agent Lewis asked Defendant why Lamont Lewis called her personal cellular telephone within a half-hour or an hour of committing the arson.  (June 11 Hr'g Tr. 243, 266.)  In response, Defendant asked, "[d]id I answer the phone?"  (*Id.* at 243, 267.)  Special Agent Lewis replied that Defendant's non-answering of Lamont Lewis's call was a pre-arranged signal.  (*Id.* at 242.)  Defendant said that she probably did not answer the phone because she thought Lamont Lewis was crazy for calling so early in the morning.  (*Id.* at 242-43, 267.)

When the law enforcement officials and Defendant arrived at the FBI Philadelphia Field Office, discussion about the October 8, 2004 phone call from Kaboni Savage continued. (*Id.* at 246.) Officer Zielinksi and Detective Rossiter were present with Special Agent Lewis and Defendant in the FBI's offices. (*Id.* at 267.) Shortly after the conversation resumed, Defendant indicated that she would have to tell the truth when her lawyer was with her. (*Id.* at 246-47, 267.) This statement was the first mention of a lawyer. (*Id.* at 248, 275.) Once Defendant mentioned being accompanied by an attorney, the law enforcement officials ended the interview and continued to process Defendant by taking her fingerprints and photographs and sending her to pretrial services. (*Id.* at 247.)

The testimony of Special Agent Lewis was credible.

## III.    CONCLUSIONS OF LAW

Defendant seeks to suppress statements made after her arrest on June 22, 2011. In doing so, Defendant advances a number of legal conclusions without providing any factual support. Defendant simultaneously argues: Defendant never received a *Miranda* warning; or, if Defendant received a *Miranda* warning, Defendant never intelligently, knowingly, and understandingly waived her rights to silence or counsel; any statements made were involuntary and the product of an overborne will resulting from a weak and deficient mentality; Defendant was physically and psychologically coerced into speaking with law enforcement officials; and regardless of whether Defendant received a *Miranda* warning, questioning continued after Defendant invoked her right to counsel. (Def.'s Mot. 2-4.) In its response, the Government argues that Defendant volunteered information to the law enforcement officials, Defendant was given proper *Miranda* warnings, and that questioning ended upon Defendant's mention of

possible representation.  (Gov't's Resp. 2, 4, 6.)

A.     **Defendant Volunteered Pre-*Miranda* Inculpatory Statements**

"The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  *Miranda's* prophylactic measures protect against "the inherently coercive nature of custodial interrogation [that] 'blurs the line between voluntary and involuntary statements.'" *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2401 (2011) (quoting *Dickerson v. United States*, 530 U.S. 428, 435 (2000)).  One who is subject to custodial interrogation must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney . . . ." *Miranda*, 384 U.S. at 436.

Whether a suspect is "in custody" is an objective inquiry hinging on the circumstances of the interrogation and the nature of the restriction on that suspect's freedom.  *Stansbury v. California*, 511 U.S. 318, 322-23 (1994) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).  Courts make a determination about custody for *Miranda* purposes "based on how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004).  Being advised that you are under arrest is perhaps the most significant factor in determining that a suspect is in custody.  *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (listing factors relevant to a determination of whether a suspect is in

fact in custody).[6]  In this case, upon arriving at Defendant's place of work, Special Agent Lewis

explained to Defendant that she was under arrest, listed the charges, and placed Defendant in

handcuffs.  (June 11 Hr'g Tr. 231, 251.)  Clearly, Defendant was in custody at this time.  *See*

*United States v. Crews*, No. 06-418, 2009 WL 426646, at *6 (W.D. Pa. Feb. 20, 2009) (finding

defendant was in custody once he was placed in handcuffs).

Once in custody, a suspect is subject to interrogation when police engage in express

questioning or use words or actions "that [they] should know are reasonably likely to elicit an

incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

In determining whether there was a functional interrogation that would invoke the protections of

*Miranda*, courts look to the circumstances of the interaction between the police and the suspect.

*See United States v. Benton*, 996 F.2d 642, 644 (3d Cir. 1993) (finding that there was no

interrogation as police did not create a "contrived situation").  For the purposes of determining

whether a law enforcement official attempted to induce an incriminating admission, the focus is

"'primarily upon the perceptions of the suspect, rather than the intent of the police.'"  *United*

*States v. Brownlee*, 454 F.3d 131, 147 (3d Cir. 2006) (quoting *Innis*, 446 U.S. at 301).

Following her arrest and placement in handcuffs, the officers left Defendant in a separate

---

[6] These factors include:

(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Willaman*, 437 F.3d at 359-60 (citing *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004); *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001); *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000).

room at Prudential's facilities.  (June 11 Hr'g Tr. 231.)  While in custody at Defendant's place of

employment, Defendant repeatedly, and without provocation, referred to Lewis as a "syruphead"

and questioned why Special Agent Lewis believed him.  (*Id.* at 230-31.)  Even if a suspect is in

custody, the prophylactic protections of *Miranda* are not implicated "where one, not under the

stress of interrogation, simply volunteers a statement which perchance turns out to be

inculpatory."  *United States v. Fioravanti*, 412 F.2d 407, 413-14 (3d Cir. 1969); *see, e.g.*, *United

States v. Daniels*, No. 09-569, 2010 WL 2163844, at *3 (E.D. Pa. May 27, 2010) (finding

spontaneous statements by the defendant admissible where statements were not responsive to any

police questioning); *United States v. Fogle*, 515 F. Supp. 2d 474, 491 (D. N.J. 2007) (finding

inquiry into whether suspect was in custody superfluous where statements were volunteered

without police interrogation); *United States v. Barnes*, No. 05-134, 2005 WL 1899502, at *4

(E.D. Pa. Aug. 8, 2005) (finding suspect's statements made while in custody were volunteered

rather than a response to police interrogation).

There is nothing in this record to indicate that the officers engaged in a functional

interrogation that was reasonably likely to elicit an incriminating response from Defendant.  The

statements at Defendant's place of work were made voluntarily and were not the result of a

custodial interrogation.  Accordingly, they will not be suppressed.

### B.    Defendant Was Given a Valid *Miranda* Warning

Once Defendant was escorted into the FBI's vehicle for transportation to Philadelphia,

Special Agent Lewis recognized that there might be a timing issue with regard to processing

Defendant and getting before a magistrate judge.  (June 11 Hr'g Tr. 240.)  While in the

automobile, in the presence of Officer Zielinksi and Detective Rossiter, Special Agent Lewis

verbally advised Defendant of her *Miranda* rights. (*Id.*) There is nothing in the record to the contrary. The record reflects that Special Agent Lewis properly advised Defendant of her *Miranda* warnings in the vehicle prior to any interrogation. *See United States v. Huggins*, 392 F. App'x 50, 57-58 (3d Cir. 2010) (crediting officer's testimony regarding issuing of *Miranda* rights to suspect).

### C.  Defendant Voluntarily Waived Her *Miranda* Rights

"A defendant may waive [her] *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) (quoting *Miranda*, 384 U.S. at 444). There are two elements to a voluntary waiver of *Miranda's* protections: first, a suspect's waiver must be voluntary in the sense that it is the "product of an essentially free and unconstrained choice by its maker . . . ." *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994). Second, the waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2260 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The burden rests with the Government to establish by a preponderance of the evidence that a confession was made voluntarily. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

While courts should examine "all the surrounding circumstances and the entire course of police conduct" in its inquiry into the voluntariness of a statement, evidence that a suspect decides to speak after being issued *Miranda* warnings is highly probative. *United States v. Naranjo*, 223 F. App'x 167, 169-170 (3d Cir. 2007) (quoting *Oregon v. Elstad*, 470 U.S. 298, 318 (1985)). Statements are involuntary if the suspect's "will was overborne in such a way as to render his confession the production of coercion." *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir.

2002) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991)). A lack of evidence regarding officers' use of coercive tactics similarly impacts a voluntariness analysis. *Naranjo*, 223 F. App'x at 170; *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) ("A necessary predicate to a finding of involuntariness is coercive police activity."); *see, e.g.*, *Pruden*, 398 F.3d at 247 (finding a *Miranda* waiver valid where there were no allegations of mistreatment, intimidation, or deprivation of food or sleep while a suspect was detained); *United States v. Kabiarets*, 496 F. Supp. 2d 394, 402 (D. Del. 2007) (finding *Miranda* waiver voluntary where there was no evidence of coercion, intimidation, or deception).

Special Agent Lewis testified that, after advising Defendant of her *Miranda* warnings, he asked whether she understood her rights and was willing to talk to the law enforcement officials. (June 11 Hr'g Tr. 241.) Defendant replied that she understood her rights and was willing to speak with the officials. (*Id.*) There is no evidence of coercion. Defendant does not claim that she was in any way physically assaulted, nor does she claim that she felt threatened. *See Berghuis*, 130 S.Ct. at 2263 (finding valid *Miranda* waiver when there was no evidence of coercion). The fact that this conversation occurred in a law enforcement vehicle while Defendant was handcuffed does not render the environment inherently coercive. *See United States v. Pruden*, No. 02-142, 2003 WL 21383693, at *5 (D. Del. 2003). Moreover, at the time of her arrest, Defendant was twenty-nine years old. The officials arrested Defendant around 1:00 pm at her place of employment. (June 11 Hr'g Tr. 250.)

Considering the totality of the circumstances, the Government has met its burden of establishing that Defendant's statements were made voluntarily. Special Agent Lewis advised Defendant of her *Miranda* rights, asked if she understood them, and asked if Defendant wanted to

talk with the law enforcement officials as she was transported to Philadelphia for processing.  (*Id.* at 241.)  There is no evidence in the record of any police coercion or that the officials created an environment that was inherently intimidating or threatening to Defendant.

### E.    Law Enforcement Questioning Ended Appropriately

Under *Miranda* and its progeny, once a suspect indicates that he wants to remain silent or avail himself of an attorney, questioning must cease and law enforcement officials may not deliberately elicit incriminating information.  *See Michigan v. Mosley*, 423 U.S. 96, 100 (1975); *United States v. Colon*, No. 98-587, 2000 WL 388728, at *5 (E.D. Pa. Apr. 14, 2000) (citing *Massiah v. United States*, 377 U.S. 201 (1964)).  The manner in which a suspect invokes his right to silence or an attorney is critical.  To properly terminate questioning, a suspect must unequivocally invoke his right to counsel or right to silence.  *See Davis v. United States*, 512 U.S. 452, 459, 461-62 (1994) (holding that law enforcement officials are not required to end an interrogation or clarify a suspect's intentions when a suspect makes an ambiguous or equivocal statement concerning an attorney); *see also Berghuis*, 130 S.Ct. at 2261 (requiring suspect to unambiguously invoke his right to silence to cut off questioning).  Whether a suspect has invoked his right to counsel or his right to silence is "an objective inquiry."  *United States v. Cates*, No. 09-22, 2010 WL 1687833, at *5 (W.D. Pa. April 26, 2010) (citing *Davis*, 512 U.S. at 459); *see also Berghuis*, 130 S.Ct. at 2260.

Defendant's statement in the FBI's Philadelphia Field Offices, "[w]ell, I guess I'll just have to tell you the truth when I have my lawyer with me" (June 11 Hr'g Tr. 246-47), was ambiguous.  That statement was Defendant's only mention of counsel throughout the entire interaction with the law enforcement officials.  Upon this one mention of a lawyer, Special Agent

Lewis and his colleagues terminated their questioning. (*Id.* at 247.) Even if Defendant had properly invoked her right to counsel, the law enforcement officials promptly terminated their interrogation when Defendant mentioned the word counsel. We are satisfied that there was no violation of *Miranda* here.

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's Motion to Suppress Post-Arrest Statements will be denied.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**