**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **KIDADA SAVAGE,** | : | **NO. 07-cr-550-6** |
| **Defendant.** | : | |

**MEMORANDUM**

**KENNEY, J.** **August 31, 2026**

Before the Court is Defendant Kidada Savage's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255 (ECF No. 1780, the "Petition"). In 2013, following a jury trial, Kidada was convicted of numerous counts of murder, witness retaliation, and RICO conspiracy, stemming from her participation in the murders of six Coleman family members who died in a firebombing on October 9, 2004. ECF No. 1330. In 2014, Judge Surrick sentenced Kidada to life imprisonment. ECF No. 1556. After a failed appeal to the Third Circuit, Kidada filed the instant Petition in December 2024. ECF No. 1780. For the reasons stated below, the Petition (ECF No. 1780) will be denied.

## I. BACKGROUND

The facts are drawn from the Third Circuit's summary of the case in its opinion affirming the jury's guilty verdicts and sentences for Kidada Savage and two of her co-defendants on direct appeal. *See United States v. Savage*, 85 F.4th 102 (3d Cir. 2023) (hereinafter "*Savage II*"). Kidada Savage, along with co-defendants Robert Merritt and Steven Northington, was indicted and convicted for her role in the violent activities of the Kaboni Savage Organization ("KSO"), a regional drug trafficking gang operating in North Philadelphia that was led by Kidada's older

brother, Kaboni Savage.[1] *Id.* at 112. From 1997 to 2010, the KSO sold powder cocaine, "crack" cocaine, and liquid phencyclidine ("PCP"). *Id.* In 2004, Kaboni was arrested by federal authorities for drug trafficking, money laundering, and firearm offenses. *See United States v. Savage*, 970 F.3d 217, 234 & n.2 (3d Cir. 2020) (hereinafter "*Savage I*"). While Kaboni was in custody awaiting trial for those charges, "Kidada coordinated KSO activities and issued orders to other KSO members on her brother's behalf." *Savage II*, 85 F.4th at 112. In particular, Kidada helped Kaboni orchestrate the firebombing of the Coleman family home, which resulted in the deaths of six individuals. *Id.* at 112–13.

The firebombing occurred in October 2004 as retaliation for former KSO member Eugene Coleman's cooperation with the government. *Id.* at 112. Between July and October of 2004, Kaboni shared with Kidada his concern that Coleman was assisting the prosecution with respect to Kaboni's federal drug trafficking case. *Id.* While visiting her brother in jail, Kidada saw Coleman and encouraged him to not "let these crackers break you." *Savage I*, 970 F.3d at 234 (record citation omitted). She also wrote Coleman a letter, warning him not to divulge anything to the authorities with the reminder, "Death before Dishonor (to your family)." *Id.* (record citation omitted). "Coleman understood that parenthetical to threaten his personal family, not members of the KSO." *Id.*

Kaboni then instructed Kidada to recruit Lamont Lewis, a high-ranking KSO member, to firebomb Coleman's family home in retaliation for Coleman's cooperation with the federal government. *Id.* On October 8, 2004, Lewis pledged his loyalty to Kaboni over the phone before handing the phone to Kidada. *Savage II*, 85 F.4th at 112. After Kidada finished speaking with her

---

[1] To differentiate between the two Savage siblings, the Court will refer to Kidada Savage and Kaboni Savage by their first names throughout this Memorandum Opinion.

brother, she told Lewis that Kaboni had ordered him to "firebomb the Colemans' house." *Id.* (record citation omitted). "Kidada instructed that the firebombing should be done around 3:00 or 4:00 a.m. when 'everybody is in the house,' and she promised to give Lewis $5,000 for his efforts." *Id.* (record citation omitted). Because Lewis did not know where the Colemans lived, Kidada drove him to the street where Coleman lived and "pointed out the house" to him. *Savage I*, 970 F.3d at 234 (record citation omitted). She also cautioned him that the Colemans had a pit bull and that there may be guns in the house. *Id.*

At approximately 4:00 a.m. the following morning, Lewis and his cousin, co-defendant Merritt, filled two cans with gasoline, then lit and threw both cans into the Colemans' house after Lewis kicked in the front door and fired his gun twice. *Id.* at 234–35. An explosion and fire ensued, ravaging the house. *Id.* Having completed his assignment, Lewis called Kidada's phone and left a message, stating that "it was done." *Savage II*, 85 F.4th at 113.

The firebombing killed all six individuals who were sleeping in the house that night: Coleman's mother, Marcella Coleman; his fifteen-month-old son, Damir Jenkins; his twin-brother's fifteen-year-old son, Sean Rodriguez; his sister Regina Nash's twelve-year-old son, Tajh Porchea; his cousin, Tameka Nash; and Tameka's ten-year-old daughter, Khadijah Nash. *Savage I*, 970 F.3d at 235.

Lewis later learned that four children were killed in the firebombing and confronted Kidada about the fact that there were children in the house. *Id.* In response, Kidada said, "F*** 'em." *Id.* (record citation omitted). Kidada ended up paying Lewis only part of the $5,000 she had promised him. *Id.*

On May 9, 2012, a grand jury in the Eastern District of Pennsylvania returned the Fourth Superseding Indictment in this case, which charged Kidada with one count of RICO conspiracy,

six counts of murder in aid of racketeering, one count of retaliation against a witness, and one count of using fire in the commission of a felony. *Savage II*, 85 F.4th at 113. Following a jury trial, Kidada was found guilty on all nine counts for which she had been indicted. *Id.* at 114. On February 21, 2014, the District Court sentenced Kidada to concurrent terms of life imprisonment for the RICO conspiracy, murder, and retaliation counts, and a consecutive ten-year sentence for the remaining count. *Id.* Kidada timely appealed her convictions and sentences to the Third Circuit, which affirmed the judgment of the District Court following a comprehensive review of the record. *Id.* at 114, 139. Kidada's petition for a writ of certiorari was denied by the United States Supreme Court. *Savage v. United States*, 144 S. Ct. 1020 (Mem) (2024).

On December 2, 2024, Kidada filed the instant *pro se* Petition. ECF No. 1780. On November 6, 2025, the above-captioned case was reassigned from Judge Surrick to this Court. ECF No. 1787. After being ordered to do so, the Government filed its response to the Petition on December 19, 2025. ECF Nos. 1790, 1792. To date, Kidada has not filed a reply to the Government's response. The Petition is ripe for adjudication.

## II. LEGAL STANDARD

An inmate in federal custody may challenge the validity of his sentence under 28 U.S.C. § 2255 by filing a petition for a writ of habeas corpus. *See Okereke v. United States*, 307 F.3d 117, 120 (3d Cir. 2002). Pursuant to 28 U.S.C. § 2255, a court may "vacate, set aside or correct" a sentence that "(1) was imposed in violation of the Constitution or laws of the United States; (2) was imposed by a court lacking jurisdiction; (3) was in excess of the maximum authorized by law; or (4) is otherwise subject to collateral attack." *United States v. Small*, 747 F. Supp. 3d 817, 821 (E.D. Pa. 2024) (citing 28 U.S.C. § 2255(a)). "A section 2255 petition is not a substitute for an appeal, nor may it be used to relitigate matters decided adversely on appeal." *Gov't of V.I. v.*

*Nicholas*, 759 F.2d 1073, 1074–75 (3d Cir. 1985) (citations omitted).

A prisoner's *pro se* habeas petition should be construed liberally. *See Lewis v. Attorney General of U.S.*, 878 F.2d 714, 722 (3d Cir. 1989). The court accepts the truth of the petitioner's allegations when reviewing a § 2255 motion unless those allegations are "clearly frivolous on the basis of the existing record." *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005). A court is required to hold an evidentiary hearing when the motion "allege[s] any facts warranting relief under § 2255 that are not clearly resolved by the record." *See United States v. Tolliver*, 800 F.3d 138, 141 (3d Cir. 2015) (quoting *Booth*, 432 F.3d at 546) (alteration in original). However, bald assertions and conclusory allegations do not provide sufficient grounds to require an evidentiary hearing. *United States v. Donahue*, 792 F. App'x 165, 168 (3d Cir. 2019).

Claims for ineffective assistance of counsel are governed by the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (acknowledging that *Strickland* governs claims for ineffective assistance of counsel). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" such that petitioner was effectively denied "counsel" as guaranteed by the Sixth Amendment, with reasonableness being judged by the professional norms prevailing at the time that counsel rendered assistance. *Strickland*, 466 U.S. at 688, 690. In evaluating the reasonableness of counsel's performance, courts "must be highly deferential" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Under the second *Strickland* prong, a petitioner must demonstrate that counsel's errors were prejudicial—that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one that is

"sufficient to undermine confidence in the outcome." *Id.* at 694. Further, "[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (quoting *Strickland*, 466 U.S. at 696). In ruling on a § 2255 petition, the court may address the prejudice prong first "and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced." *Rolan v. Vaughn*, 445 F.3d 671, 678 (3d Cir. 2006).

## III. DISCUSSION

Kidada raises just one claim in her Petition, a claim for ineffective assistance of counsel based on a conflict of interest that one of her two trial attorneys, Christopher Phillips, allegedly had. ECF No. 1780 at 7–14. This claim was raised by Kidada on her direct appeal to the Third Circuit, which rejected the claim, finding that Kidada "failed to establish an actual conflict of interest." *Savage II*, 85 F.4th at 117. The relevant facts of Kidada's conflict of interest claim were succinctly summarized by the Third Circuit as follows:

> On March 19, 2013, six weeks into trial, at an off-the-record conference, the government disclosed its receipt from the Philadelphia District Attorney's Office of an "assignment" document showing that Phillips, while working in that office as an assistant district attorney, had been assigned in October 2003 to prosecute Kaboni and a co-defendant, Anthony Mitchell, for the murder of Kenneth Lassiter. This revelation raised the possibility of a conflict of interest, not only because Phillips had once been assigned to prosecute Kidada's brother, but also because the government in this case had charged the Lassiter murder as a predicate offense for the RICO conspiracy charge, and Phillips was tasked with defending Kidada as to that count.
>
> To address the potential conflict, the government moved on April 5, 2013, for an evidentiary hearing. The District Court granted the motion and subsequently appointed separate counsel to represent the interests of Kidada and of Phillips with respect to the alleged conflict. Kidada's conflicts counsel then filed a motion for a mistrial on April 26, 2013. Instead of immediately holding an evidentiary hearing, the Court allowed the trial to continue uninterrupted, and the jury returned a guilty verdict against Kidada on May 13, 2013.

> A few days after the jury returned its verdict, the District Court set a briefing schedule for the mistrial motion and scheduled a hearing for June 17, 2013. Phillips, through his conflicts counsel, filed a brief opposing the mistrial motion. At the hearing, he testified that he had no recollection of having been assigned to the Lassiter matter when he was appointed to represent Kidada. He further testified that he never reviewed the evidence in that case, met with witnesses, contacted the victim's family, or discussed the case with anyone. Indeed, nine days after Phillips was assigned to the Lassiter murder prosecution, the case was reassigned to another assistant district attorney.
>
> The District Court denied Kidada's motion for a mistrial. In denying the motion, the Court credited Phillips's testimony about his lack of involvement in the prior case, found that Phillips's brief assignment to the Lassiter matter did not limit his ability to vigorously defend Kidada, and observed that Kidada had failed to demonstrate that she suffered any prejudice because of Phillips's prior assignment to the Lassiter matter.

*Id.* at 115 (record citations and footnotes omitted). Addressing the merits of Kidada's claim that Phillips had a conflict of interest, the Third Circuit explained that the standard for establishing a Sixth Amendment violation based on an attorney's representation of another client was set forth by the Supreme Court in *Cuyler v. Sullivan*, which held that "a defendant must establish that an actual conflict of interest existed." *Id.* at 116 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) (internal quotations omitted)). The Third Circuit then held that Kidada failed to meet this standard, finding that Phillips' brief nine-day assignment to the Lassiter murder during his tenure as an assistant district attorney—an assignment that he did not even recall until it was brought to his attention by the Government—did not limit his ability to represent Kidada. *Id.* at 117. The Third Circuit further held that the District Court did not abuse its discretion in denying Kidada's motion for a mistrial on the basis of Phillips' alleged conflict of interest. *Id.* at 114, 116.

In the instant Petition, Kidada takes issue with two aspects of the Third Circuit's holding. First, she contests that she must prove an actual conflict of interest, arguing that the Third Circuit "erroneously held that *Cuyler v. Sullivan's* requirement that a defendant must prove an actual

conflict of interest and prejudice applies where, as here, a trial court is made aware of defense counsel's conflict of interest but fails to make a timely inquiry into it, in violation of the defendant's right to due process." ECF No. 1780 at 7. Second, Kidada challenges the Third Circuit's ruling that the District Court acted reasonably by waiting until after the jury trial was over to hold a hearing on the conflict of interest issue, contending that "the district court's failure to conduct a timely inquiry . . . was inexcusable and constituted *per se* reversible error because it denied her right to a conflict-free attorney whose loyalty was undivided." *Id.* at 14.

This Court certainly cannot overrule the Third Circuit's finding that Phillips' representation of Kidada was not infected by a conflict of interest. *See Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 867 (3d Cir. 1984); *A.A. ex rel. E.A. v. Exeter Twp. Sch. Dist.*, 485 F. Supp. 2d 587, 591 (E.D. Pa. 2007) ("It is axiomatic that a district court is bound to apply its appellate court's precedent."). The arguments raised by Kidada in the instant Petition were previously addressed by the Third Circuit. With respect to Kidada's first argument, the Third Circuit stated that its "own precedent forecloses [Kidada's] narrow reading of *Cuyler*." *Savage II*, 85 F.4th at 117 (noting that pursuant to Third Circuit case law, the existence of an actual conflict is a requirement in every conflict of interest claim). With respect to Kidada's second argument, the Third Circuit found the District Court's decision to wait until after the trial was over to inquire into the conflicts issue to be reasonable because the Sixth Amendment does not "impose[] a rigid, blanket requirement that a court halt trial proceedings to inquire into an alleged conflict." *Id.* at 116.

Because the only claim raised in Kidada's Petition has already been addressed and rejected by the Third Circuit on direct appeal, Kidada is precluded from re-litigating the claim on a post-conviction motion. *See United States v. Braddy*, 837 F. App'x 112, 115 (3d Cir. 2020) ("A § 2255 motion does not function as a second appeal and thus it does not ordinarily allow for re-review of

issues raised on direct appeal." (citation omitted)); *Gov't of V.I.*, 759 F.2d at 1074–75 ("A section 2255 petition is not a substitute for an appeal, nor may it be used to relitigate matters decided adversely on appeal." (citations omitted)); *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (stating that in § 2255 proceedings involving ineffective assistance of counsel claims, the mandate rule bars claims raised and resolved by the appellate court on direct appeal); *United States v. Butt*, 731 F.2d 75, 76 n.1 (1st Cir. 1984) ("It is settled that a § 2255 motion may not revive issues previously determined on direct appeal[.]"). Accordingly, Kidada's claim for ineffective assistance of counsel in the Petition must be dismissed as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Kidada Savage's Petition for a Writ of Habeas Corpus (ECF No. 1780). Because the issues raised in Kidada's Petition were already resolved by the Third Circuit on direct appeal, no evidentiary hearing is necessary. No certificate of appealability will issue because Kidada has not made a substantial showing of the denial of a constitutional right under 28 U.S.C. § 2253(c)(2).

An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**